IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| MAYA BABA as Administratrix of the Estate of GHASSAN RADWAN BABA,<br><br>Plaintiff,<br><br>v.<br><br>SHERIFF JEFF CRISCO et al.,<br><br>Defendants. | ) ) ) ) ) ) ) ) ) ) ) | 1:24-CV-923 |

**MEMORANDUM OPINION AND ORDER**

Catherine C. Eagles, Chief District Judge.

Ghassan Baba died from a self-inflicted gunshot during an encounter with police in 2023. On behalf of his estate, Mr. Baba's sister, Maya Baba, has sued the two officers involved in the encounter, North Carolina State Trooper Michael McCormick and Stanly County Sheriff's Deputy Josiah Garrett, as well as Stanly County Sheriff Jeff Crisco; the North Carolina Highway Patrol; and the Sheriff's surety, Cincinnati Insurance Company,[1] alleging that her brother's death resulted from an unlawful use of force, in violation of his federal and state constitutional rights and North Carolina common law. The defendants move for summary judgment on all claims. The circumstances of Mr. Baba's death were tragic, but the Court lacks jurisdiction over some of Ms. Baba's claims and there is

[1] For the sake of clarity and concision, the Court will refer to Deputy Garrett, Sheriff Crisco, and Cincinnati Insurance as the "sheriff's office defendants" and refer to Trooper McCormick and the North Carolina Highway Patrol as the "state defendants."

otherwise no evidence that the actions of the involved officers were unlawful or unreasonable. The defendants' motions for summary judgment will be granted.

## I. Facts

In the early hours of March 9, 2023, Trooper McCormick responded to a report of a single-car accident in Stanly County, North Carolina.[2] Doc. 61-1 at 96–97.[3] The report stated that the driver of the crashed vehicle was "walking down the roadway." *Id.* at 98. When Trooper McCormick arrived at the scene of the crash, he saw a car in a roadside ditch and a man, later identified as Mr. Baba, walking unsteadily in the direction of his police car. *Id.* at 102–03; McCormick's Dash Cam[4] at 3:25–3:50. Based on Mr. Baba's behavior and the circumstances of the accident, Trooper McCormick believed Mr. Baba was likely impaired. Doc. 61-1 at 104–05.

Trooper McCormick told Mr. Baba to keep coming towards him, and then almost immediately he saw the butt of a gun in Mr. Baba's waistband. *Id.* at 108, 110–11. Trooper McCormick drew his gun, pointed it at Mr. Baba, and ordered him to put his hands up. *Id.* at 109–10; *see* McCormick's Dash Cam at 3:53–3:57. Mr. Baba complied

[2] All facts are either undisputed or viewed in the light most favorable to the plaintiff, as is required at summary judgment. *See, e.g.*, *Dixon v. Edwards*, 290 F.3d 699, 710 (4th Cir. 2002).

[3] Page numbers refer to the numbering appended by the CM/ECF system rather than the internal deposition pagination.

[4] The defendants filed five videos conventionally, as reflected by docket entries at Docs. 46, 57. These videos are not available on the electronic docket but are or will soon be available to view in person at the Clerk's Office. The videos referenced in this Order are: State Defendants' Exhibit 3 — Trooper McCormick's Dash Camera Video (Doc. 57) ("McCormick's Dash Cam"); State Defendants' Exhibit 5 — Deputy Garrett's Body Worn Camera Video (Doc. 57) ("Garrett's Body Cam"); State Defendants' Exhibit 7 — Sergeant Brian Butler's Dash Camera Video (Doc. 57) ("Butler's Dash Cam").

and did not reach for his gun. Doc. 61-1 at 119; McCormick's Dash Cam at 3:53–4:04. Trooper McCormick told Mr. Baba that help was on the way, and Mr. Baba repeatedly yelled back "I don't need help" and "[d]on't do it." Doc. 61-1 at 124. Trooper McCormick ordered Mr. Baba to go down on his knees. *Id.* at 154. Mr. Baba twice went down on one knee, before then standing back up. *Id.*; McCormick's Dash Cam at 4:00–6:20.

Like Trooper McCormick, Deputy Garrett received a dispatch call about a man standing near a wrecked car. Doc. 45-4 at 7. He began responding to the call, but Trooper McCormick indicated over the radio that he would take care of it. *Id.* at 8. Almost immediately though, Trooper McCormick came back over the radio to request backup from "a county car," because he had "one at gun point." *Id.* at 9. Deputy Garrett responded. *Id.* at 10–11. When he arrived at the scene, he saw the car in the ditch and Trooper McCormick standing near his patrol car with his gun drawn. *Id.* at 12–13; *see* McCormick's Dash Cam at 6:30–6:35. He also saw Mr. Baba with his hands visible. Doc. 45-4 at 13, 15; *see* McCormick's Dash Cam at 6:30–6:35. Deputy Garrett exited his car and drew his gun. Doc. 45-4 at 14; *see* McCormick's Dash Cam at 6:30–6:35.

At that point, the three men were standing roughly in a triangle formation, with Mr. Baba at the top of the triangle. Doc. 45-4 at 18; McCormick's Dash Cam at 6:32. Deputy Garrett ordered Mr. Baba to get on the ground, and Trooper McCormick ordered Mr. Baba to get on his knees. Doc. 45-4 at 19. Mr. Baba did not comply with either command. *Id.* at 20. Less than a minute after Deputy Garrett arrived, Mr. Baba turned and ran away from the officers in the direction of some nearby houses. *Id.* at 20, 22–23.

As he turned to run, Mr. Baba reached toward his waistband.[5] McCormick's Dash Cam at 6:32–6:37.

The officers pursued Mr. Baba on foot approximately 100 to 200 yards through open residential backyards. Doc. 61-1 at 156–57. Mr. Baba then tripped and fell. *Id.* at 158. When he stood back up, he opened fire on the officers. *Id.* at 159; Doc. 59-3 at 4 (internal investigation noting that five spent shell casings were found near Mr. Baba's body that matched the remaining ammunition in his weapon). The officers, who were between 15 and 50 feet away from Mr. Baba, Doc. 45-4 at 29; Doc. 61-1 at 159, returned fire. Doc. 45-4 at 30; Doc. 61-1 at 161. After a brief but sustained exchange of gunfire, Doc. 61-1 at 161–64, Mr. Baba went down to his knees and shot himself in the head.[6] Doc. 45-4 at 33–34.

At that point, Deputy Garrett activated both his radio and his body worn camera.[7] *Id.* at 12, 36–37. He reported "[s]hots fired" over the radio. *Id.* at 37; *see* Butler's Dash Cam at 2:50–2:56. Another officer, Sergeant Butler, responded to provide further backup.

[5] Deputy Garrett recalls seeing Mr. Baba draw his gun before fleeing. Doc. 45-4 at 20. Trooper McCormick does not remember seeing him draw his gun at that time. Doc. 61-1 at 156. Viewing the facts in the light most favorable to the plaintiff, as required at summary judgment, the Court assumes that Mr. Baba had not drawn his gun before fleeing.

[6] Ms. Baba states that Trooper McCormick testified that "he never saw Mr. Baba raise his weapon to his head and attempt to commit suicide." Doc. 61 at 6. But she cites no record evidence to that effect. *See* LR 56.1(e) (requiring citation to "authenticated facts existing in the record"). Deputy Garrett's testimony, which is confirmed by the autopsy and ballistics findings, *see infra* at 5-6, is therefore undisputed. Fed. R. Civ. P. 56(e).

[7] Trooper McCormick was not wearing a body worn camera, because the North Carolina Highway Patrol did not begin issuing them until December 2024, well after the events at issue in this case. Doc. 61-1 at 50–51.

*See* Doc. 45-4 at 37–38; Butler's Dash Cam at 2:50–5:00. When Sergeant Butler arrived, Trooper McCormick and Deputy Garrett were standing several dozen feet away from Mr. Baba's body. Garrett's Body Cam at 1:20–1:45; Butler's Dash Cam at 4:50–5:00. Sergeant Butler and Deputy Garrett approached Mr. Baba's body. Doc. 45-4 at 39; Garrett's Body Cam at 1:30–1:50. Sergeant Butler kicked Mr. Baba's gun away, and Deputy Garrett checked for a pulse but was unable to feel one. Doc. 45-4 at 39–40; Garrett's Body Cam at 1:30–1:50. Mr. Baba was pronounced dead at the scene. Doc. 59-5 at 13; Doc. 59-6 at 5.

That morning, SBI agents conducted a forensic crime scene investigation. Doc. 59-7. They found three different types of shell casings on the scene:

- 9mm "WIN" corresponding to the ammunition in Deputy Garrett's pistol, *see id.* at 8 (describing a Glock magazine "containing 1 live WIN 9mm Luger + P round"); Doc. 45-4 at 19 (Deputy Garrett stating that he was carrying a 9mm Glock);
- .357 "Speer" corresponding to the ammunition in Trooper McCormick's pistol, *see* Doc. 59-7 at 10 (describing a SIG magazine containing " 4 x live Speer 357 SIG 15 rounds"); Doc. 61-1 at 48 (Trooper McCormick stating he was carrying a .357 caliber pistol); and
- 9mm "WMA" corresponding to Mr. Baba's pistol. Doc. 59-7 at 7, 9 (describing a "tan Sig Sauer P320 M17 handgun" and "tan/black Sig Sauer 9mm magazine containing 9 x WMA 22 live rounds" found next to Mr. Baba's body).

The only shell casings found next to Mr. Baba's body were 9mm "WMA," *Id.* at 9–11, 34 (report and crime scene diagram depicting evidence markers near Mr. Baba's body corresponding only to his own shell casings), and thus from Mr. Baba's gun.

After autopsy, the medical examiner identified seven gunshot wounds on Mr. Baba's body and "opined that Mr. Baba died from a self-inflicted gunshot wound to the head." Doc. 59-5 at 7–8. She based that opinion on "the presence of seared soot and gunpowder grains indicating a near contact range gunshot wound to the head, combined with the absence of the police officers being close to him." Doc. 45-7 at 3. Mr. Baba's blood tested positive for "cocaine, benzoylecgonine (metabolite of cocaine), methamphetamine, amphetamine (metabolite of methamphetamine), alprazolam, 7-aminoclonazepam (metabolite of clonazepam), and delta-9-THC." Doc. 59-5 at 7.

## II. Summary Judgment Standard

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In analyzing a summary judgment motion, courts "must construe all facts and reasonable inferences in the light most favorable to the nonmoving party." *Bandy v. City of Salem*, 59 F.4th 705, 709 (4th Cir. 2023). The moving party has the initial burden of demonstrating the absence of any material issue of fact; once the moving party meets its initial burden, the non-moving party must come forward with evidentiary material demonstrating the existence of a

genuine issue of material fact requiring a trial. *Id.* at 709–10; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

## III. Analysis

Ms. Baba has brought the following claims on behalf of her brother's estate:

1. Negligence, gross negligence, and wrongful death against all defendants;
2. Violation of 42 U.S.C. § 1983 against Trooper McCormick and Deputy Garrett based on excessive force;
3. Intentional infliction of emotional distress against Trooper McCormick and Deputy Garrett;
4. Violation of Article I § 1 and § 19 of the North Carolina constitution against all defendants;[8] and
5. Violation of 42 U.S.C. § 1983 against the Stanly County Sheriff's Office and the North Carolina Highway patrol based on failure to properly train.

Doc. 1 at ¶¶ 39–95. Ms. Baba has sued Trooper McCormick and Deputy Garrett in both their individual and official capacities. *Id.* at ¶¶ 15, 17. She has sued Sheriff Crisco only in his official capacity. *Id.* at ¶ 10. All defendants move for summary judgment on all claims against them. Docs. 44, 55.

---

[8] Neither party explains what provisions, if any, of Article I § 1 or § 19 protect against the use of excessive force by law enforcement or what the elements of such a claim would be. *See* LR 56.1(e). Thus, the Court will assume that the *Corum* claims are coextensive with the federal constitutional claims. *See Tri Cnty. Paving, Inc. v. Ashe Cnty.*, 281 F.3d 430, 435 n.6 (4th Cir. 2002). To the extent that Ms. Baba intended to bring a claim under Article I § 20, which protects against unreasonable searches and seizures, the Court's analysis would not change, since that provision is analogous to the federal Fourth Amendment. *See Stidham v. Beal*, No. 25-CV-63, 2026 WL 686465, at *5 & n.5 (W.D.N.C. Mar. 11, 2026); *see also infra* at III(B).

### A. Sovereign Immunity

As a threshold matter, the state defendants assert that because of sovereign immunity, the Court lacks subject matter jurisdiction over Ms. Baba's state law claims against the Highway Patrol and Trooper McCormick in his official capacity. That is correct.

Under the doctrine of sovereign immunity, "suits against nonconsenting States are not properly susceptible of litigation in courts, and the entire judicial power granted by the constitution does not embrace authority to entertain such suits in the absence of the State's consent." *Alden v. Maine*, 527 U.S. 706, 754 (1999) (cleaned up); *see* U.S. Const. amend. XI. "This immunity extends to arms of the State, including state agencies and state officers acting in their official capacity." *Cromer v. Brown*, 88 F.3d 1315, 1332 (4th Cir. 1996) (cleaned up). States can waive their sovereign immunity and consent to suit, but they are not required to do so. *Alden*, 527 U.S. at 755. If a state chooses to waive its sovereign immunity by statute, it can place conditions or limits on that waiver. *Bullock v. Napolitano*, 666 F.3d 281, 284 (4th Cir. 2012) ("Any statutory waiver of sovereign immunity can thus condition or limit the waiver.").

North Carolina has enacted a limited waiver of its sovereign immunity as to "any claim that arises as a result of the negligence of any officer, employee, involuntary servant, or agent of the State while acting within the scope of his office." N.C. Gen. Stat. § 143-291(e). That waiver is conditional and applies only to claims filed with the North Carolina Industrial Commission. *Id.* "Any such claims filed in any other forum arising out of or relating to the same subject matter . . . is precluded." *Id.*

Ms. Baba has brought her official capacity negligence claims in federal district court, which is a forum other than the North Carolina Industrial Commission. As a result, the conditions of the waiver are not met, and the state's sovereign immunity remains intact. Similarly, Ms. Baba's intentional infliction of emotional distress claims against Trooper McCormick in his official capacity is also barred by sovereign immunity, since North Carolina's waiver of sovereign immunity is limited to negligent acts. *White v. Trew*, 366 N.C. 360, 363, 736 S.E.2d 166, 168 (2013) ("[S]overeign immunity bars an intentional tort claim against a public official in his official capacity.").

Because the state has not waived its sovereign immunity, this Court is without subject matter jurisdiction to consider these claims. *See Cunningham v. Gen. Dynamics. Info. Tech., Inc.*, 888 F.3d 640, 649 (4th Cir. 2018). They will be dismissed without prejudice.

**B. Remaining Claims**

As for the remaining claims, both sets of defendants present various reasons why no reasonable jury could find for Ms. Baba. They contend, for example, that there is an absence of evidence in support of the claims, the claims are barred by various immunity doctrines, or both. The undisputed facts point to only one conclusion: Mr. Baba's death was tragic, but the officers' actions were not unreasonable. Because evidence that the officers' actions were unreasonable is required to meet an essential element of all of the plaintiff's remaining claims, the motions for summary judgment will be granted.

To survive a motion for summary judgment, a plaintiff must put forward evidence supporting each essential element of her claims. *Celotex*, 477 U.S. at 322–23. Here, to

succeed on any of her remaining claims, Ms. Baba must show that the actions of either Trooper McCormick or Deputy Garrett were unreasonable. *See Keith v. Health-Pro Home Care Servs., Inc.*, 381 N.C. 442, 450, 873 S.E.2d 567, 574 (2022) (elements of negligence); *Clayton v. Branson*, 170 N.C. App. 438, 442, 613 S.E.2d 259, 264 (2005) (elements of gross negligence); *DiDonato v. Wortman*, 320 N.C. 423, 426, 358 S.E.2d 489, 491 (1987) (explaining that a wrongful death action is predicated on "negligence or some other misconduct"); *Est. of Green v. City of Annapolis*, 696 F. Supp. 3d 130, 154 (D. Md. 2023) (elements of Fourth Amendment excessive force claim); *Clark v. Clark*, 280 N.C. App. 403, 414, 867 S.E.2d 704, 715 (2021) (elements of intentional infliction of emotional distress); *Owen v. Goodwin*, No. 21-CV-217, 2023 WL 6446204, at *7 (W.D.N.C. Sep. 29, 2023) (explaining that an excessive force claim under the North Carolina constitution is assessed no differently than a Fourth Amendment excessive force claim); *Caraway v. City of Pineville*, 639 F. Supp. 3d 560, 583 (W.D.N.C. 2022) (elements of § 1983 failure to train claim).

To determine whether a use of force was reasonable, the factfinder must assess "whether the force deployed was justified from the perspective of a reasonable officer on the scene." *Barnes v. Felix*, 605 U.S. 73, 79 (2025) (cleaned up). "That inquiry requires analyzing the totality of the circumstances." *Id.* at 80 (cleaned up).

The totality of the circumstances includes not just the "situation at the precise time of the shooting," but also "earlier facts and circumstances that may bear on how a

reasonable officer would have understood and responded to later ones."[9] *Id.* (cleaned up). And "attempted deescalation is but one of many factors" in the totality of the circumstances analysis. *Morgan*, 180 F.4th at 168. "At the end of the day, all that matters is whether the officers' actions were reasonable." *Id.* (cleaned up).

Trooper McCormick testified that when he arrived at the scene of the reported accident, he saw a car in a ditch and a lone man walking unsteadily on a poorly lit rural road in the middle of the night. Doc. 61-1 at 96–98, 102–06, 108–09. He testified that the man had a gun visible in his waistband and was walking towards him. *Id.* at 108. That testimony is uncontradicted, and dashcam footage corroborates it. McCormick's Dash Cam at 3:25–3:52.

Considering those undisputed facts, Trooper McCormick's decisions to draw his weapon and order Mr. Baba to go to his knees and put his hands up were objectively reasonable. *See United States v. Sinclair*, 983 F.2d 598, 602 (4th Cir. 1993) ("[I]nvestigating officers may take steps reasonably necessary to maintain the status quo and to protect their safety, including drawing their weapons."); *United States v. Baker*, 78 F.3d 135, 137–38 (4th Cir. 1996) ("A police officer's interest in self-protection arises when he reasonably believes that a suspect is armed and dangerous."); *Magwood v. Fowler*, No. 19-CV-2277, 2021 WL 3410482, at *7 (D.S.C. May 19, 2021) (Mag. J,

---

[9] Ms. Baba confusingly relies on the Fourth Circuit's pre-*Barnes* "moment-of-threat" rule at some points, *e.g.*, Doc. 61 at 9–10 (citing *Waterman v. Batton*, 393 F.3d 471, 477, 481 (4th Cir. 2005), and *Betton v. Belue*, 942 F.3d 184, 191 (4th Cir. 2019)), while relying on the *Barnes* understanding of the "totality of the circumstances" test at others. *E.g.,* Doc. 64 at 9–10. To be clear, *Barnes* abrogated earlier cases relying on the moment-of-threat rule, as the Fourth Circuit has recognized. *Morgan v. City of Charlotte*, 180 F.4th 159, 167 (4th Cir. 2026).

report and recommendation) ("In sum, there is no case that establishes that pointing a weapon at a suspect believed to be armed during an investigatory stop, where that suspect is not yet secure, violates the Fourth Amendment."), *adopted*, 2021 WL 2885975 (D.S.C. July 9, 2021).

Similarly, Deputy Garrett was responding to a call for back up involving a suspect being held at gunpoint. Doc. 45-4 at 9. When he arrived, he saw Mr. Baba with a gun in his waistband and Trooper McCormick with his gun drawn on Mr. Baba. *Id.* at 15–16. Deputy Garrett's testimony too is unrebutted, and the dashcam video from his car likewise corroborates his testimony. McCormick's Dash Cam at 6:30–6:35. In light of those undisputed facts, Deputy Garrett's decision to draw his gun was also objectively reasonable.

The undisputed evidence shows that next Mr. Baba — armed with a firearm and reasonably suspected both of being impaired and of an impaired driving offense — refused officer commands to get on his knees or on the ground. Doc. 61-1 at 156; *see* McCormick's Dash Cam at 4:00–6:20. He then turned and fled from the officers in the direction of nearby homes. Doc. 61-1 at 156–57; Doc. 45-4 at 23, 27; McCormick's Dash Cam at 6:30–6:45. The officers' decision to pursue him at that point was objectively reasonable. *See Sykes v. United States*, 564 U.S. 1, 10 (2011) ("Flight from a law enforcement officer invites, even demands, pursuit."), *overruled on other grounds by Johnson v. United States*, 576 U.S. 591 (2015). And when Mr. Baba then began shooting at the officers, it was objectively reasonable for them to return fire. *Morgan*, 180 F.4th at

166 ("No citizen can fairly expect to draw, let alone discharge, a gun on police without risking tragic consequences." (cleaned up)).

Based on Mr. Baba's injuries, it can be reasonably inferred that shots fired by the officers hit Mr. Baba several times. *See* Doc. 59-5 at 4–5 (identifying six gunshot wounds in addition to the self-inflicted head wound). But the officers' undisputed testimony is that they stopped firing immediately after Mr. Baba stopped shooting at them. Doc. 45-4 at 34; Doc. 61-1 at 163. Until Mr. Baba ceased fire, it was objectively reasonable for the officers to continue shooting back at him. *See Waterman*, 393 F.3d at 481 (explaining that once the use of deadly force is justified, it remains justified until "the justification for the initial force has been eliminated"), *abrogated on other grounds by Barnes*, 605 U.S. 73. Thus, each time the officers used force or escalated their use of force, the undisputed evidence is that their actions were objectively reasonable based on the totality of the circumstances.

Ms. Baba contends that summary judgment cannot be granted based only on the testimony of Trooper McCormick and Deputy Garrett. And she is correct to the extent that in a deadly force case, "a court may not simply accept what may be a self-serving account by the police officer." *Ingle ex rel. Est. of Ingle v. Yelton*, 439 F.3d 191, 195 (4th Cir. 2006) (cleaned up). Instead, "a court must undertake a fairly critical assessment of the forensic evidence, the officer's original reports or statements and the opinions of experts to decide whether the officer's testimony could reasonably be rejected at trial." *Id.* (cleaned up). Here, the other evidence in the record, including forensic evidence of shell casing locations, Doc. 59-7; an autopsy, Doc. 59-5; investigations, Docs. 59-3, 59-6;

the testimony of the medical examiner, Doc. 67-3; and the available dashcam and body worn camera videos, McCormick's Dash Cam, Garrett's Body Cam, all corroborate the officers' testimony. Ms. Baba has presented no narrative of events that would show unreasonable force, much less evidence to support such a narrative.

Ms. Baba asserts that some of that corroboration is suspect because the third parties that investigated this incident relied, at least to some extent, on the statements of Trooper McCormick and Deputy Garrett. *See* Doc. 61 at 13, 15. But her critiques amount to no more than speculation; she has pointed to no evidence from which a reasonable jury could infer that events of March 9, 2023, played out any differently from the way Trooper McCormick and Deputy Garrett described. Their version of events has remained consistent, *see* Doc. 59-6 at 5, and it aligns with the other available evidence. A party cannot "merely recite the incantation, 'Credibility,' and have a trial on the hope that a jury may disbelieve factually uncontested proof." *Jones v. Owens-Corning Fiberglas Corp.*, 69 F.3d 712, 718 (4th Cir. 1995) (cleaned up).

Because there is no evidence that the actions of Trooper McCormick and Deputy Garrett were objectively unreasonable, summary judgment will also be entered on Ms. Baba's other claims.[10]

[10] The sheriff's office defendants contend that Ms. Baba's claims against Cincinnati Insurance should also be dismissed because she did not expressly plead a claim under N.C. Gen. Stat. § 58-76-5. Doc. 45 at 23. The Court need not address that contention, since a surety's liability to the plaintiff extends only as far as the plaintiff was "injured by the neglect, misconduct, or misbehavior" of the underlying defendant. N.C. Gen. Stat. § 58-76-5; *see Stafford v. Barker*, 129 N.C. App. 576, 585, 502 S.E.2d 1, 6 (1998). Assuming that the claim against Cincinnati Insurance was sufficiently pled, it is not liable because there is no liability on the part of Sheriff Crisco or Deputy Garrett. Ms. Baba's claim against Cincinnati Insurance will be dismissed.

## IV. Conclusion

Mr. Baba's death is tragic, but, as the Fourth Circuit recently stated, "unfortunate circumstances alone do not automatically give rise to a cognizable legal claim." *Morgan*, 180 F.4th at 170. Because of sovereign immunity, the Court lacks subject matter jurisdiction over Ms. Baba's official capacity claims against Trooper McCormick and the Highway Patrol; they will be dismissed without prejudice. As to her other claims, all of the evidence presented to the Court shows that Trooper McCormick and Deputy Garrett acted reasonably during their encounter with Mr. Baba and that they shot Mr. Baba only after he initiated the gunfire. The defendants' motions for summary judgment will be granted as to those claims.

It is **ORDERED** that:

1. The defendants' motions for summary judgment, Docs. 44, 55, are **GRANTED**.
2. The plaintiff's official capacity claims against defendants Michael McCormick and the North Carolina State Highway Patrol are **DISMISSED without prejudice**.
3. All other claims are **DISMISSED**.
4. Judgment will be entered separately.

This the 22nd day of September, 2026.

UNITED STATES DISTRICT JUDGE